United States District Court
Southern District of Texas

**ENTERED**
June 17, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARK JAMAL KEAREY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:17-CV-00080 |
| | § | |
| BRYAN COLLIER, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

In this prisoner civil rights action, Plaintiff Mark Jamal Kearey asserts claims of retaliation as well as violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*., and the First Amendment. Kearey is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division, and is currently housed at the Coffield Unit in Tennessee Colony, Texas, but the incident he complains of occurred at the McConnell Unit in Beeville, Texas. On January 18, 2019, Defendants Bryan Collier and Chaplain Rick Packard moved for summary judgment on all remaining claims against them. (D.E. 62). Kearey responded on February 11, 2019. (D.E. 64). For the reasons discussed further below, it is recommended that the motion for summary judgment be GRANTED and Kearey's second amended complaint be DISMISSED in part for lack of standing and DENIED in part.

## I.    JURISDICTION

The Court has federal question jurisdiction for claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

## II.    BACKGROUND

### a.    Complaint and Claims

In his second amended complaint, which is verified, Kearey alleges the following. (D.E. 57 at 1-8).[1]  Kearey asked Chaplain Packard to allow the Eastern religions study group to update their religious videos because the existing videos were of poor quality and did not cover the full spectrum of Eastern religions, specifically, Taoism.  (*Id.* at 2). The prison also had no texts or books available on Taoism.  Packard told Kearey to send a proposed book and DVD, titled "Shaolin Qigong - Energy In Motion," to him for review.  Willie Swift, a fellow inmate, donated the book and DVD to the study group. (*Id.*).

Kearey further alleges that, when the study group did not receive the materials or any notice of a denial, he asked Packard what was happening.  (*Id.* at 2-3).  Packard responded that he had not received the package yet.  (*Id.* at 3).  However, Swift's sister had tracked the package and knew that it had been delivered.  When Kearey and Swift told Packard, he stated that he had received the package, but had not reviewed the materials and would do so within one week.  A week later, Packard informed them that both the book and DVD had been denied as a security threat because they depicted someone swinging a stick.  Packard told them that the materials would have to be

---

[1] D.E. 57 is listed after D.E. 25 on the docket sheet.

approved by a major.  (*Id.*).  After three weeks of waiting for any response by the major, Kearey returned to Packard's office, but Packard became slightly hostile and told Kearey to stop coming to his office.  (*Id.* at 3-4).

Kearey further alleges that, at this point, several members of the study group filed grievances, and Kearey filed a grievance on July 21, 2016.  (*Id.* at 4).  One week later, Packard confiscated the group's yoga mats and videos.  Packard stated that he did this because they wrote grievances. Packard indicated that the group would have to meet in a classroom setting and that, if they wanted to participate in moving meditation in the future, they would need an outside volunteer to lead them.  Kearey told Packard that a classroom setting was not suitable for Eastern religions, particularly Taoism, because they involved meditation and moving meditation, but Packard responded that he did not care.  (*Id.*).

Kearey further alleges that he went to the law library and reviewed the chaplaincy manual, where he found that the materials were supposed to be sent to Huntsville and then, if approved, to Packard.  (*Id.* at 4-5).  Moreover, rejected materials were supposed to be returned to the donor.  (*Id.* at 5).  Kearey's grievances were denied because the materials were denied under a mailroom policy and Packard had no authority to approve or deny them.  Kearey then reviewed the mailroom policy and determined that there was no consideration of the RLUIPA requirements in the policy.  He sent the mailroom supervisor a list of several Eastern religion books to determine if they were acceptable, but no one responded.  Thus, he asked Swift to order two of the books, titled "Tendon Nei Kung" and "Life Pulse Massage."  Both of the books were denied.  (*Id.*).  Without

3

the books, Kearey could not receive adequate instruction on the Taoist principles of energy and spirit.  He had substantially modified his religious behavior because he could no longer practice moving meditation as required by his religion.  (*Id.* at 6).

Kearey alleges: (1) First Amendment claims against Collier in his official capacity and Packard in his individual capacity; (2) an RLUIPA claim against Collier in his official capacity; and (3) a retaliation claim against Packard in his individual capacity. (*Id.* at 1, 7-8).[2]

### b.   Summary Judgment Evidence

At the *Spears*[3] hearing, Kearey testified to the following.  (D.E. 35-1).  Packard took away the study group's yoga mats, books, and videos a week after they filed their grievances.  (*Id.* at 3).  The study group used those materials for practicing moving meditation, typically yoga.  They had been doing so without a volunteer being present for two to three years.  After being told that they needed a volunteer, Kearey looked up the policies and found that there was a policy requiring a volunteer for Buddhists to practice moving meditation.  However, he believed that this contradicted another policy that allowed inmates at least four hours a month to practice their religion however they wanted.  (*Id.*).  Kearey never ordered any books himself.  (*Id.* at 4).  He submitted a list of books he wanted to order and some were marked as denied.  (*Id.*).  Packard told him that

---

[2] The Court dismissed Kearey's other claims.  (*See* D.E. 51 at 23-24; D.E. 52 at 1-2).

[3] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

he confiscated the study materials because the group wrote grievances. (*Id.* at 7). Kearey could practice his meditations privately, although he preferred not to. (*Id.* at 8).

In July 2016, Kearey filed a step one grievance complaining about the denial of the book and DVD as a security risk. (D.E. 62-3 at 5). He stated that the video had no violent intent, but rather consisted of moving meditations. (*Id.*). The warden responded that, according to the Huntsville Chaplaincy Manual, yoga was not part of the ecumenical order of worship service and required an outside volunteer to supervise. (*Id.* at 6). Kearey then filed a step two grievance, arguing that meditation was part of his religion and that requiring an outside volunteer denied him meaningful access to an important part of his beliefs. (*Id.* at 3). He argued that the volunteer requirement favored inmates of other, larger religions because it was easier for them to find volunteers. (*Id.*). The Director of Chaplaincy Operations responded that materials that went through the mailroom were subject to mailroom policies and that the Chaplaincy had no authority to approve or deny such materials. (*Id.* at 4). The grievance investigation worksheet for the step two grievance indicated that Packard told the investigator that the requested video and book taught tai chi, a form of martial arts, and were therefore a security risk. (*Id.* at 12).

Kearey then filed another step one grievance, complaining that Packard lied by telling him to send the videos directly to him, even though he had no authority to approve or deny them. (*Id.* at 15). The warden responded that investigation revealed that the videos were sent unsolicited to the Chaplaincy Department rather than to Kearey through the mailroom. (*Id.* at 16). However, the warden stated that even had the videos gone

5

through the mailroom, they would have been denied.  (*Id.*).  Kearey filed a step two grievance, arguing that the package was not sent unsolicited to the Chaplaincy Department because Packard told him to send it there.  (*Id.* at 13).  The Assistant Director of Chaplaincy Operations denied the grievance on the same grounds as step one.  (*Id.* at 14).

Finally, Kearey filed a third step one grievance, complaining that the mailroom denied three books that he wanted to order, including "Tai Chi Wu Style," "Life Pulse Massage," and "Tendon Nei Kung."  (D.E. 65-2 at 1).  He contended that the books were denied because the mailroom did not understand Eastern religions and used a blanket policy to deny religious exercise like tai chi, which was not necessarily a martial art. Kearey argued that this was not the least restrictive means of ensuring security.  (*Id.*). The warden responded that the mailroom processed all incoming mail according policy and that there was no record that any of the books Kearey mentioned were received at the McConnell Unit.  (*Id.* at 2).  Kearey filed a step two grievance, stating that he wrote to the mailroom assistant asking her whether certain books would be accepted or denied. (*Id.* at 3).  Swift ordered some of the books.  (*Id.*).  A TDCJ employee responded that there was no record of the mailroom denying any books to Kearey.  (*Id.* at 4).

In the letter to the mailroom, Kearey asked whether six books would be approved. (D.E. 65-1 at 1).  Two were marked denied, two were marked approved, one was marked pending, and another was marked not found.  (*Id.*).

Mailroom records showed that Swift was denied a book titled "Tendon Nei Kung" because it included several defensive and offensive fighting techniques.  (D.E. 62-4 at 4).

6

The back cover of the book identified the subject matter as "martial arts." (*Id.* at 6). Swift was also denied a book titled "Life Pulse Massage" because it contained sexually explicit images. (*Id.* at 8).

The TDCJ policy on religious programming provided that offenders would be provided the opportunity for programming that did "not endanger safe, secure, and orderly operations." (D.E. 62-1 at 2). Space for religious programming would be designated based on safety and orderly operations. (*Id.* at 6). The TDCJ would provide at least four one-hour services per month for primary religious programming for each identified religious group. (*Id.*). Religious programming was to be facilitated by the chaplain, a certified volunteer chaplain assistant, or an outside volunteer. (*Id.* at 7). If none could attend a scheduled primary religious program, then staff would supervise, subject to availability. However, if a certain group's beliefs, doctrines, or practices posed a security threat, religious programming may be restricted for that group. (*Id.*).

The TDCJ correspondence policy provided that all publications were subject to inspection by the Mail System Coordinators Panel, which is a centralized authority for the review of publications, and unit staff. (D.E. 62-5 at 3, 12). Offenders did not have to be notified if a publication was being held for review. (*Id.* at 12). A publication could be rejected if, among other reasons, it contained sexually explicit images, although publications constituting educational, medical, scientific, or artistic materials could be allowed on a case-by-case basis. (*Id.*). If a publication was rejected, the offender had to be notified within three days. (*Id.* at 13).

## III.  DISCUSSION

### a.   Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence or evaluate the credibility of witnesses.  *Id.*  The Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Salazar-Limon v. City of Houston*, 826 F.3d 272, 274-75 (5th Cir. 2016).  In doing so, the Court can credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).  Furthermore, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. *Anderson*, 477 U.S. at 248. However, on summary judgment, the factual allegations in a verified complaint may be treated the same as an affidavit. *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). A complaint is verified when the plaintiff signs a declaration under the penalty of perjury that its contents are true and correct. *Id.* "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

### b.   Standing

In their motion for summary judgment, Defendants argue that Kearey lacks standing to raise his claims because the books and videos were sent to a different inmate. (D.E. 62 at 6). Defendants argue that Kearey did not suffer an injury-in-fact because he was never denied any books or videos. (*Id.* at 12-13). Thus, Defendants argue that this Court lacks jurisdiction to consider Kearey's claims. (*Id.* at 13).

Kearey responds that he has standing to challenge the denial of the books and video to his fellow inmate because he asked Packard about the items and was part of the

same study group.  (D.E. 64 at 8-9).  He argues that he personally requested to purchase other books related to his religious beliefs, but those were also denied.  (*Id.* at 9).

In order to establish standing, a plaintiff must establish three elements.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  First, he must show that he suffered an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent.  *Id.* at 560.  The plaintiff himself must have suffered this injury and cannot rest his claim on the rights or interests of a third party.  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Second, there must be a causal connection between the injury and the conduct complaint of.  *Lujan*, 504 U.S. at 560. Finally, it must be likely that the injury will be redressed by a favorable decision.  *Id.* at 561.

Here, to the extent that Kearey alleges that Defendants violated his RLUIPA and First Amendment rights by denying the admission of the book and video ordered by Swift, he lacks standing to raise that claim because he has not shown a personalized injury-in-fact.  Swift ordered the book and video, not Kearey, and any injury resulting from their denial belongs to Swift.  (D.E. 57 at 2-3; D.E. 35-1 at 4).  Although Kearey and other members of the study group subsequently filed grievances, the book and video were denied to Swift, and Kearey cannot raise a claim based on the rights or interests of Swift as a third party.  (D.E. 57 at 4); *Warth*, 422 U.S. at 499.  Similarly, to the extent that Kearey's claims are based on the actual denial by the mailroom of the books titled "Tendon Nei Kung" and "Life Pulse Massage," he lacks standing for the same reason

10

because the books were ordered by Swift.  (D.E. 57 at 5).  Thus, it is recommended that those claims be dismissed for lack of standing.

However, Kearey has standing to raise his claim that the mailroom denied several books, including "Tendon Nei Kung" and "Life Pulse Massage," that he wished to order because he has alleged a personal injury-in-fact where he personally submitted the list for preapproval.  (*Id.*; D.E. 35-1 at 4; D.E. 65-1 at 1).  Although Kearey concedes that he never personally ordered any books, he did seek preapproval of certain books before ordering them and was told that several would be denied under mailroom policy.  (D.E. 65-1 at 1).  Moreover, Kearey has standing to raise his claims regarding the denial of moving meditations in a group setting, the requirement of an outside volunteer, and Packard's alleged retaliation because he has alleged a personal injury-in-fact.

### c.   RLUIPA

Liberally construed, Kearey's claims against Collier under RLUIPA are that he has suffered a substantial burden on his religious exercise because TDCJ policy: (1) effectively denied him access to certain Eastern religious texts and videotapes; (2) denied him the ability to practice moving meditations and yoga within a group setting; and (3) required him to obtain an outside volunteer for his moving meditations.

In the motion for summary judgment, Collier contends that Kearey has not raised a genuine issue of material fact regarding a violation of his religious beliefs under RLUIPA.  (D.E. 62 at 15).  Collier asserts that the denial of the new books and video was at most a *de minimis* burden on Kearey's exercise of religion and did not substantially interfere with a tenet or belief that is central to a religious doctrine because Kearey

11

requests only "updated" videos. (*Id.* at 15-16). Further, Collier argues that the requirement of an outside volunteer for moving meditations does not violate Kearey's religious rights because he has admitted that he can practice the meditations privately and there is no substantial burden on his exercise of religion. (*Id.* at 17-18). Moreover, Collier contends that, even if Kearey's religious rights have been substantially burdened, the TDCJ has several compelling government interests supporting the restrictions, including security concerns. (*Id.* at 18-20). He argues that the requirement of an outside volunteer is the least restrictive means of ensuring security, as is the prohibition on religious texts that contain fighting techniques and sexually explicit material. (*Id.* at 20). Collier asserts that these concerns are particularly relevant regarding Kearey, who was convicted of attempted capital murder and aggravated assault with a deadly weapon. (*Id.* at 21).

Kearey responds that the denial of the religious books and video was a substantial burden on his religious beliefs because those materials would have taught him more about the practice and exercise of his religion. (D.E. 64 at 9-10). He argues that the TDCJ had no compelling governmental interest in denying religious materials that were nonviolent and contained no sexually-explicit material. (*Id.* at 10). Kearey asserts that the TDCJ remains in possession of the books and video, but has not provided any evidence that they are violent or sexually explicit. He argues that while he can perform moving meditation in his cell, it is inherently unsafe due to the confined space and various hard objects around the cell. (*Id.*).

Section 3 of the RLUIPA concerns institutionalized persons and states:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1)     is in furtherance of a compelling governmental interest; and

(2)     is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA implements a burden-shifting framework. *Ware v. Louisiana Dep't of Corr.*, 866 F.3d 263, 268 (5th Cir. 2017); *Chance v. Tex. Dep't of Crim. Justice*, 730 F.3d 404, 410-11 (5th Cir. 2013). The plaintiff's initial burden is two-fold: he or she must show that: (1) the relevant religious exercise is "grounded in a sincerely held religious belief"; and (2) the government's action or policy "substantially burden[s] that exercise" by, for example forcing the plaintiff "to 'engage in conduct that seriously violates [his or her] religious beliefs.'" *Holt v. Hobbs,* 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 719-20 (2014)). If the plaintiff carries this burden, the government bears the burden of proof to show that its action or policy: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a); *Holt,* 135 S. Ct. at 863.

Despite RLUIPA's express purpose to protect the religious observances of institutionalized persons, the statute does not give courts carte blanche to second-guess the reasoned judgments of prison officials. Indeed, while Congress enacted the RLUIPA to address the many "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, it nevertheless anticipated that courts entertaining RLUIPA challenges

13

"would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter v. Wilkinson,* 544 U.S. 709, 716-17 (2005) (*quoting* 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)). The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests." *Id.* at 722.

RLUIPA broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The Fifth Circuit has determined that governmental action or regulation creates a "substantial burden" on a religious exercise if it "truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). A governmental action or regulation does not rise to the level of a substantial burden on religious freedom if it "merely prevents the adherent from enjoying some benefit that is not otherwise generally available." *Id.*

In *Adkins*, the Fifth Circuit Court of Appeals considered an RLUIPA claim brought by a member of the Yahweh Evangelical Assembly ("YEA") based on the inability of the YEA to congregate on regular Sabbath and YEA holy days. *Adkins*, 393 F.3d at 571. After citing the TDCJ's general policy which required the presence of an outside volunteer for group religious meetings, the Fifth Circuit concluded that summary judgment was proper as to the prisoners' RLUIPA claim because the plaintiff had not

14

established that the volunteer policy imposed a substantial burden on the exercise of religion. *Id.* The Fifth Circuit subsequently recognized that *Adkins* did not set forth a "*per se* rule that the TDCJ's volunteer requirement could never impose a substantial burden on a prisoner's exercise of religion." *Mayfield v. Texas Dep't of Criminal Justice*, 529 F.3d 599, 614 (5th Cir. 2008).

Here, Collier does not dispute that Kearey's claims are grounded in a sincerely held religious belief, so the relevant question is whether the TDCJ's actions and policies have substantially burdened his religious exercise. *Holt*, 135 S. Ct. at 862. First, the alleged denial of the books and video have not substantially burdened Kearey's religious exercise because he merely asked for "updated" materials. (D.E. 57 at 2). Kearey does not explain how the existing materials are inadequate, other than stating that he cannot receive adequate instruction on Taoist principles without new materials. (*Id.* at 6). However, the mailroom approved two of the six books on the list that Kearey submitted, with a third marked "pending" and a fourth marked "not found." (D.E. 65-1 at 1). Kearey has not established that his religious exercise has been substantially burdened where, under mailroom policy, two books were approved and two were denied.

Kearey has also not established a genuine issue of material fact regarding whether his religious exercise has been substantially burdened as to his claims regarding the denial of the opportunity to partake in moving meditation in a group setting and the requirement to find an outside volunteer for moving meditation. Kearey conceded that group meditation is not a religious requirement and that he is able to do the meditations on his own. (D.E. 35-1 at 8). Similarly, he conceded that he can still meditate in his cell,

15

although he prefers not to.  (*Id.*).  Because individual meditation is both religiously acceptable and available to Kearey, he has not shown that TDCJ policy has forced him to "significantly modify his religious behavior and significantly violate[] his religious beliefs." *Adkins*, 393 F.3d at 570.

Because Kearey has not established that his religious exercise was substantially burdened, it is unnecessary to address whether the restrictions were in furtherance of a compelling governmental interest.  *See Holt,* 135 S. Ct. at 863.  Accordingly, it is recommended that Kearey's RLUIPA claims against Collier be denied.

### d.   First Amendment

Kearey's First Amendment claims against Packard and Collier are based on the same allegations as his RLUIPA claims.

Defendants argue that Kearey has not established a First Amendment violation because he suffered only an isolated incident or *de minimis* burden on his free exercise of religion.  (D.E. 62 at 22).  They reiterate that the materials that Kearey requested were denied because they were a security threat and included sexually explicit material.  (*Id.*). Defendants argue that any restriction on Kearey's exercise of religion was rationally related to the TDCJ's legitimate penological interest in maintaining safety and preventing security threats.  (*Id.* at 23).

Kearey does not directly address his First Amendment claims in his response, however, liberally construed, he argues that the denial of the books and video was more than a *de minimis* burden on his exercise of religion because he was prevented from learning more about the practice of Taoism.  (D.E. 64 at 9-10).  He argues that the TDCJ

16

has no legitimate penological interest in denying religious materials that are nonviolent and not sexually explicit. (*Id.* at 10).

The First Amendment to the United States Constitution provides that Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof. U.S. Const., amend. I. The United States Supreme Court has held that prisoners retain their First Amendment rights, including the right to free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

Nevertheless, an inmate retains only those First Amendment rights which "are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Thus, a prisoner's right to practice his religion may be limited where the prison officials establish that there is a legitimate penological objective. *Id.*; *Cruz v. Beto*, 405 U.S. 319, 322, n. 2 (1972) (per curiam); *Hicks v. Garner*, 69 F.3d 22, 25 (5th Cir. 1995). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *O'Lone*, 482 U.S. at 349 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

In *Turner v. Safley*, the Supreme Court set forth four factors that a court should consider in determining whether a reasonable relationship exists between a regulation and the governmental interest: (1) whether the regulation has a logical connection to the legitimate government interests invoked to justify it; (2) whether there are alternative means of exercising the rights that remain open to the inmates; (3) the impact that accommodation of the asserted constitutional right will have on other inmates, guards and

17

prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 89-90; *see also Chriceol v. Phillips*, 169 F.3d 313, 316 (5th Cir. 1999).

Issues of prison security are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence . . . that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."  *Pell*, 417 U.S. at 827.  In *Mayfield*, the Fifth Circuit concluded that the TDCJ's fears regarding security were a legitimate penological interest and that the denial of runestones to Odinist inmates was rationally related to that interest.  *Mayfield*, 529 F.3d at 611.  Although the inmate complained that other religions were allowed religious scripts and other items, he presented no evidence that those presented similar security risks.  *Id.*  Staff and space limitations are also valid penological interests.  *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 861 (5th Cir. 2004).

Here, Kearey has failed to establish a genuine issue of material fact regarding whether each of the TDCJ actions and policies that he complains of were rationally related to a legitimate penological interest.  First, applying the *Turner* factors, the mailroom's denial of two books, "Tendon Nei Kung" and "Life Pulse Massage," had a logical connection to the prison's legitimate interest in protecting safety.  (D.E. 65-1 at 1); *Turner*, 482 U.S. at 89-90.  Mailroom records from when Swift actually ordered the books indicated that they included defensive and offensive fighting techniques and

18

sexually explicit material, respectively. (D.E. 62-4 at 4, 8). Kearey does not dispute that some of the materials he seeks include tai chi, although he contends that not all tai chi is necessarily a martial art that threatens safety. (D.E. 65-2 at 1). However, issues of prison security are within the professional expertise of TDCJ officials and their determinations are given deference. *Pell*, 417 U.S. at 827. Notably, the back cover of "Tendon Nei Kung" self-identifies the book's subject matter as martial arts. (D.E. 62-4 at 6). As to the second *Turner* factor, the TDCJ provided Kearey alternative means of exercising his religious rights because, although the mailroom denied two of the books he requested, it also approved two books that he requested. (D.E. 65-1 at 1); *Turner*, 482 U.S. at 90. Third, allowing access to materials involving martial arts or sexually explicit material could have a negative impact on prison staff, inmates, and prison resources because inmates in the study group may need additional oversight and it may not be readily determinable whether a particular use of tai chi is meditative or aggressive. *Turner*, 482 U.S. at 90. Finally, there does not appear to be an easy alternative for the TDCJ, nor has Kearey proposed one. *Id.*

Further, the denial of the opportunity to partake in moving meditation in a group setting and the requirement to find an outside volunteer for moving meditation are also logically related to legitimate penological interests, including security and staff limitations. *Turner*, 482 U.S. at 89-90; *Freeman*, 369 F.3d at 861 (stating that space and staff limitations are valid penological concerns). As to the second factor, as previously noted, Kearey has an alternative means of practicing moving meditation because he can do so on his own. (D.E. 35-1 at 8); *Turner*, 482 U.S. at 90. Third, allowing the study

19

group to participate in moving meditation without an outside volunteer could impact prison staff and inmates by requiring staff to oversee the sessions. *Turner*, 482 U.S. at 90; *Freeman*, 369 F.3d at 861 (noting that the TDCJ must administer religious services to tens of thousands of inmates and needs flexibility to accommodate the entire prison population). Finally, there is no clear, better alternative for the TDCJ, particularly where Kearey and other inmates interested in doing moving meditation may still do so on their own. *Turner*, 482 U.S. at 90.

Accordingly, because each of the actions and policies that Kearey complains of were rationally related to legitimate penological interests, it is recommended that his First Amendment claims against Defendants be denied.

### e.   Retaliation

Plaintiff claims that, after he and other members of the Eastern Religions Study Group had filed grievances, Packard retaliated one week later by taking away various moving meditation videos and books that had already been approved for use by the Eastern Religions Study Group and by removing the mats and blankets used by the group in their yoga and moving meditation sessions.

Packard argues that Kearey fails to raise a genuine issue of material fact regarding retaliation. (D.E. 62 at 23). He argues that Kearey has presented no evidence supporting his claim that the removal of the yoga mats and rugs from the religious group and requirement that the inmates to practice their meditation in a classroom with an outside volunteer were retaliatory. (*Id.* at 24). Packard contends that both actions were in

furtherance of existing TDCJ policy and Kearey cannot establish that the execution of a policy would not have occurred but for a retaliatory motive.  (*Id.* at 24-25).

Kearey responds that Packard told him that he took the yoga mats and rugs away because of the grievances.  (D.E. 64 at 11).  Further, Kearey argues that the close proximity of the grievances and Packard's actions establish that they were retaliatory.  He argues that requiring an outside volunteer is not in accordance with TDCJ policy, which allows for prison security staff to monitor their meetings and requires at least four one-hour periods each month for inmates to practice their religion.  (*Id.*).

Retaliation is not expressly referred to in the Constitution, but it is nonetheless actionable because retaliatory actions may tend to chill an individual's exercise of constitutional rights.  *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  Retaliation is actionable if the retaliatory act could deter a person of ordinary firmness from exercising his constitutional rights.  *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006).

The purpose of allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights.  *Id.*  Thus, "[a] prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct."  *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995).  An action taken by prison officials that is motivated by retaliatory animus may be actionable even though it would be legitimate if taken for a different reason.  *Id.* at 1165.

The Fifth Circuit has emphasized that courts must carefully scrutinize prisoners' claims of retaliation.  *Id.* at 1166.  In addition, the Fifth Circuit has concluded that some

acts, even though they may be motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights. *Morris*, 449 F.3d at 686. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim. *Id.* For example, a job transfer from the commissary to the kitchen might be *de minimis*, while a transfer to a more dangerous unit might constitute an adverse retaliatory act. *Id.* at 687.

To state a valid § 1983 claim for retaliation, a prisoner must allege: (1) a specific constitutional right; (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right; (3) a retaliatory adverse act; and (4) causation. *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999). An inmate must allege more than his personal belief that he is the victim of retaliation. *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997). Mere conclusory allegations of retaliation will not withstand a summary judgment challenge. *Woods*, 60 F.3d at 1166. The inmate must produce direct evidence of motivation or a chronology of events from which retaliation may be inferred. *Id.* A successful claim of retaliation requires a showing that, but for some retaliatory motive, the complained of adverse incident would not have occurred. *Id.*

Here, although Kearey has identified the First Amendment right to file grievances and alleged that Packard intended to retaliate against him for the exercise of that right, he has not established a retaliatory adverse act that has more than a *de minimis* effect on his rights. (D.E. 57 at 4); *Morris*, 449 F.3d at 686. Kearey alleges that, in retaliation for filing grievances, Packard: (1) removed the study group's yoga mats, books, and videos; (2) told the group that they would need to meet in a classroom setting; and (3) required

22

the group to find an outside volunteer if they wanted to practice moving meditation. (D.E. 57 at 4).  The evidence does not establish that these actions would deter an ordinary person from further exercise of his rights.  *Morris*, 449 F.3d at 686.  First, the study group is still allowed to meet in a classroom setting.  (*See* D.E. 57 at 4).  Second, Kearey has conceded that the requirement of an outside volunteer is consistent with a TDCJ policy. (D.E. 35-1 at 3).   Third, Kearey can still do moving meditation on his own.  (*Id.* at 8). Thus, although Packard imposed greater restrictions on the study group, they are still allowed to meet, these changes were consistent with the TDCJ's existing policy, and Kearey can still do moving meditation.  Under these circumstances, the evidence does not show that these acts would deter an ordinary person from filing grievances in the future.

### f.  Qualified Immunity

Finally, Packard argues that he is entitled to qualified immunity because Kearey has presented no genuine issue of material fact regarding the violation of any clearly established constitutional right.  (D.E. 62 at 26).  Moreover, he argues that even if he violated a clearly established constitutional right, his actions were objectively reasonable based on the TDCJ policy requiring outside volunteers.  (*Id.* at 26-27).

Kearey responds that Packard is not entitled to qualified immunity because his acts of retaliation were against clearly established law.  (D.E. 64 at 11).

Qualified immunity protects government officials performing discretionary functions from civil damages liability if their actions were objectively reasonable under clearly established law.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The immunity

is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Once a government employee asserts the defense of qualified immunity, the burden shifts to a plaintiff to demonstrate that qualified immunity does not bar their recovery. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). A two-step process has traditionally been employed in evaluating the defense of qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under the traditional approach, a court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.* Second, if the plaintiff has satisfied the first step, courts are required to decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* However, the Supreme Court has held that a case may be dismissed based on either step in the qualified immunity analysis as "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in the light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, summary judgment is proper on Kearey's First Amendment and retaliation claims against Packard on the alternative ground that Packard is entitled to qualified immunity. As discussed above, Kearey has failed to create a genuine issue of material fact regarding the violation of a constitutional right as to either of his claims against Packard. *See Saucier*, 533 U.S. at 201. Thus, the qualified immunity analysis need not reach the question of whether the rights at issue were clearly established.

## IV.  RECOMMENDATION

Accordingly, it is respectfully recommended that Defendants' motion for summary judgment (D.E. 62) be GRANTED and Kearey's second amended complaint (D.E. 57) be DISMISSED in part for lack of standing and DENIED in part.

Respectfully submitted this 17th day of June, 2019.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs*. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

25